UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM NO. 3:15CR34(JAM) |
| | : | |
| V. | : | **FILED UNDER SEAL** |
| | : | |
| GEORGE BRATSENIS & | : | |
| RANDI FELICIANO | : | February 11, 2016 |

UNITED STATES' TRIAL MEMORANDUM AND
NOTICE OF INTENT TO OFFER EVIDENCE

The United States of America, by and through the undersigned Assistant United States Attorneys, respectfully submits this omnibus trial memorandum as an aid to the Court and to address issues that may arise concerning the admission of evidence at trial.   Jury selection is scheduled for May 5, 2016 at 9:00 a.m.   Part I summarizes the nature of the Government's case, and the nature of the charges.   Part II specifically addresses the following evidentiary issues:

• The admissibility of evidence of the background of the conspiracy charged in order to explain how the illegal relationship between co-defendant Africa and Bratsenis developed and to explain the mutual trust between Bratsenis and Africa;

• The admissibility of non-hearsay testimony that provide a context to, and background concerning, the investigation;

• The admissibility of statements made by co-conspirators as non-hearsay or as exceptions to the hearsay rule.

## I.     The Government's Case

### A.     Factual Background

The Government will prove its case through the testimony of civilian witnesses and law enforcement officials, expert testimony in cellular networks and historical cell site analysis, the testimony of a cooperating witness, video surveillance, business records, prison phone calls and correspondence, cellphone data seized pursuant to search warrants and other physical evidence. During the pre-trial conference that took place on January 14, 2016, the Government estimated that the presentation of its case-in-chief would take approximately one week.    Upon further review of the evidence and number of potential witnesses, the Government respectfully estimates that trial could take two weeks, including opening statements, summations and charge.

#### 1.     Relationship Between Africa and Bratsenis

Bomani Africa and defendant George Bratsenis met while incarcerated at the same New Jersey State prison.    Bratsenis was incarcerated for a bank robbery conviction and Africa was incarcerated for a robbery conviction.    From 1999 through 2006, Bratsenis and Africa were both assigned to Block 2C, eight cells apart in cells 32 and 40.

The Government will prove at trial that, either during their time in prison or soon after both were released, Bratsenis and Africa planned to rob banks together.

#### 2.     The Darien Bank Robbery

In the Spring of 2014, Bratsenis and Africa planned the robbery of the People's United Bank located at 25 Old Kings Highway Road in Darien, Connecticut.    On April 30, 2014, Bratsenis, driving his white Chevrolet pick-up truck, dropped Africa off in downtown Darien, near the railroad station.    Around 2:15 p.m., a single individual, wearing a blue hooded sweater, gloves, a mask and jeans – whom the Government will prove at trial was Africa – entered the

People's United Bank located near the railroad station with an umbrella. Upon entering the bank, Africa dropped the umbrella, pulled out a gun and jumped over the teller station counter. Africa told the teller to open the first and second drawer, and said "I will shoot you if you don't give me all your money!" Africa took a substantial amount of cash and placed it in a "leopard" colored pillow case. Africa then jumped the counter and left the bank. Africa was last seen running to the back of the bank next to the railroad tracks. Bratsenis picked Africa up on the other side of the railroad tracks from the bank and they both left the scene. Witnesses described the handgun as a revolver with a brown handle and a long barrel. The umbrella handle was swabbed for DNA and sent to the Connecticut State Lab.

     3.    <u>The Trumbull Robbery</u>

At some point prior to September 24, 2014, Africa recruited his son, co-defendant Randi Felciano, to help Bratsenis and Africa rob another bank. The evidence will establish that Africa and Feliciano agreed to drive together from the Philadelphia area – the area where they lived separately – to Connecticut in the early morning hours of September 25, 2014 for the purpose of meeting Bratsenis and robbing a bank in Trumbull, Connecticut.

On the evening of September 24, 2014, at approximately 5:35 p.m., Africa left Feliciano a voice message, saying, "Hey, man. Turn on that phone, bruh." In a later message at 11:35 p.m. on September 24, 2014, Africa said, "Hey man. Give me a call when you are on your way. I'll talk to you then, brother. Peace." In a subsequent message, also marked 11:35 p.m. on September 24, 2014, Africa said, "Yo man. Where you at man? [U/I] We got two…we gotta leave by two [a.m.], man. Hit me up." In another message, Africa stated, "Yo, man. You gotta let me know something, brother. I told these people I'm coming, bruh. I been gave them my word and that's all I got. Just tell me yes or no, brother. I gotta call 'em. Peace."

Historical cell site records for Africa's, Feliciano's, and Bratsenis' respective cellphones during the early morning hours of September 25, 2014 show the following:

- The Africa phone and the Feliciano phone were accessing Philadelphia towers in the early morning hours of September 25, communicating with one another at approximately 12:29 a.m. and 12:33 a.m. There were no further calls between the Africa and Feliciano phones until approximately 8:43 a.m. The Government expects to prove that Africa and Feliciano were not communicating by phone between 12:33 a.m. and 8:43 a.m. because they were traveling together from Philadelphia to Connecticut.

- At approximately 2:59 a.m., the Africa phone contacted the Bratsenis phone. At the time of the call, the Bratsenis phone was accessing a tower at 3200 Park Avenue in Bridgeport, Connecticut, near Bratsenis' residence, and the Africa phone was accessing a tower in Philadelphia.

- At approximately 5:57 a.m., the Africa phone contacted the Bratsenis phone again. By this time, the Africa phone was accessing a tower in Stamford, Connecticut and the Bratsenis phone was accessing a tower in Darien, Connecticut.

On September 25, 2014, at approximately 8:30 a.m., an individual with the initials J.E. walked from her car toward the professional center at 160 Hawley Lane, Trumbull, Connecticut. As she walked, J.E. saw an older-style white pickup truck drop off a light-skinned black male, whom she subsequently identified as Africa, wearing an orange/red hooded sweatshirt. Africa walked through the parking lot toward J.E. and said good morning to her several times. J.E. continued to walk and noticed that the white pickup truck had parked in a parking space. She continued into the building.

A few minutes later, a second woman with the initials D.S. sat in a silver Ford Fusion she had just entered in the parking lot near the same professional building. The Ford Fusion was a rental from Avis, bearing New Jersey plates. As D.S. sat in the vehicle, she was approached by a light-skinned black male, whom she subsequently identified as Africa, wearing a maroon

hooded sweatshirt and khaki pants.    Africa pointed a gun at D.S., told her to get out of the car, and demanded her purse.    D.S. screamed and jumped out of the car, holding her purse.    Africa jumped into the car and, still pointing his gun at D.S., yelled at her because he could not get the car to start.    D.S. backed away from the car while telling Africa how to start it.    As soon as the car started, D.S. ran away.    J.E. watched the carjacking occur from the building and recognized the carjacker as the light-skinned black male who had approached her.    J.E. observed the white pickup truck back out of its parking space when Africa approached the silver Ford Fusion.

Historical cell site records for Africa's, Feliciano's, and Bratsenis' respective cellphones for the rest of the day on September 25, 2014, following the carjacking, show the following:

- At approximately 8:43 a.m. – just after the time of the carjacking – the Africa phone and the Feliciano phone began communicating by cell phone, with the Africa phone accessing a tower in Bridgeport, Connecticut and the Feliciano phone accessing a tower in Stratford, Connecticut.    The Africa phone and the Feliciano phone communicated every few minutes between approximately 8:43 a.m. and 9:16 a.m.    By 9:08 a.m, the Africa phone was accessing towers in Bridgeport, Connecticut and the Feliciano phone was accessing towers in Trumbull, Connecticut.

- Later that morning, between 9:16 a.m. and 10:04 a.m., the Feliciano phone and the Bratsenis phone accessed the same tower in Trumbull, Connecticut. Between 10:29 a.m. and 11:05 a.m., the Bratsenis phone and the Africa phone accessed the tower at 3200 Park Avenue in Bridgeport, Connecticut, near Bratsenis' residence.    The Feliciano phone accessed the tower at 3200 Park Avenue in Bridgeport, Connecticut at 11:18 and 11:20 a.m.

- At various times between 12:00 p.m. and 1:09 p.m., each of the Bratsenis, Africa and Feliciano phones accessed the same cell phone tower at the University of Bridgeport in Bridgeport, Connecticut.

- At various times between 1:28 p.m. and 3:29 p.m., each of the Bratsenis, Africa and the Feliciano phones accessed the same cell phone tower at 305 Canal Street in Shelton, Connecticut.

- By approximately 8:06 p.m, the Bratsenis phone was again accessing the 3200 Park Avenue tower in Bridgeport, Connecticut, near Bratsenis' residence.    At

6:28 p.m., the Feliciano phone was accessing a tower on S. Orange Center Road in Orange, Connecticut.

The Government will introduce this cell tower data, together with the testimony of J.E. and D.S., to place Africa, Feliciano and Bratsenis in the vicinity of the carjacking on September 25, 2014, and in the vicinity of each other at various times later in the day on September 25, 2014.

In the early morning hours of September 26, 2014 – the day of the Trumbull bank robbery – cell tower records for Africa's, Feliciano's, and Bratsenis' cellphones show the following:

- At approximately 7:21 a.m., the Bratsenis phone called the Africa phone. The Bratsenis phone accessed the 3200 Park Avenue tower near Bratsenis' residence in Bridgeport, Connecticut, while the Africa phone accessed the tower on S. Orange Center Road in Orange, Connecticut – which the Feliciano phone had accessed the night before.

- At approximately 7:29 a.m., the Feliciano phone called the Africa phone, with each phone accessing the same tower in Milford, Connecticut.

- At approximately 7:56 a.m., the Bratsenis phone called the Africa phone, with the Bratsenis phone accessing a tower in Derby, Connecticut.

- None of the Bratsenis, Africa or Feliciano phones were used between 7:58 a.m. and 9:35 a.m.

The Government will introduce this cell tower data to show that Africa, Feliciano and Bratsenis communicated in the early morning hours of September 26, 2014 just prior to the robbery and stopped communicating by phone just before 8:00 a.m.

On September 26, 2014, at approximately 8:30 a.m., a Sacred Heart University (hereinafter "SHU") bus driver with the initials N.D. saw an older white Chevy S10 pickup truck drive erratically in the west parking lot of the Trumbull Shopping Mall, which is used as an overflow parking lot for SHU. Another SHU employee with the initials D.M., who arrived at the parking lot at 8:30 a.m., heard a loud engine and noticed an older, white, small, pick-up truck

driving in the lot.    A silver or white sedan and a black SUV followed it.    All three cars backed into parking spaces next to each other, with the silver car in the middle.    K.M. saw a black male, who the Government will prove at trial was Africa, get out of the silver car and into the passenger side of the black SUV, and saw an older white male, in his 60's, with light gray hair and a "smurf"-like beard, who the Government will prove at trial was Bratsenis, driving the pickup.

At approximately 9:14 a.m., two males in hooded sweatshirts, masks, gloves and dark jeans entered the People's Bank located at 4180 Madison Avenue in Trumbull, Connecticut, across from the Trumbull Shopping Mall.    One of the males – who the Government will prove at trial was Africa – was wearing a neon yellowish sweatshirt.    Africa jumped over the teller counter and demanded money from the drawers while pointing a pistol with a long barrel at a bank teller with the initials B.J.    The other male – who the Government will prove at trial was Bratsenis – was wearing a red sweatshirt and was wearing a cut-off thermal or sweatshirt arm with two holes cut out as his mask.    Bratsenis also had a gun and was taking money from drawers.    After about one minute, one of the robbers yelled out "time-time" as B.J. removed the money.    Africa took the money and jumped back over the teller counter before both men fled the bank.    Bratsenis put the money he stole into a bag, while Africa hand carried the money and dropped some as he fled.    The total amount stolen from the bank was $29,937.

A witness with the initials R.F., who arrived at the bank around the time of the robbery, noticed an unoccupied gray/silver car (later determined to be the carjacked Ford Fusion) in the parking lot; the car had its engine running.    The witness saw the two robbers run out of the bank and drive away in the silver/gray car.

Minutes later, a SHU bus driver with the initials V.S. noticed a silver car parked in the west parking lot of the Trumbull Shopping Mall. Next to the silver car was a white-colored, mid-1990's Chevrolet S-10 pickup truck with partial Connecticut registration "752." A bus passenger with the initials J.H. saw a man place something into the back of the white pickup truck and then drive away from the parking lot followed by a black Jeep. Seconds later, the silver car was engulfed in flames. Investigating officers, however, were able to determine that the silver car was the Ford Fusion that had been carjacked from the professional center in Trumbull the previous day. At the time of the fire, the Ford Fusion contained a Connecticut license plate with registration 956-WDM. The Connecticut registration 956-WDM actually belonged to a tan 2002 Nissan Altima, which was registered to T.L. of Woodbridge, Connecticut.

Connecticut Department of Motor Vehicles business records showed only one 1990's white Chevy S-10 pick-up with the partial plate "752" reported by SHU bus driver V.S. That 1995 white Chevy S-10 pick-up truck had a license plate number 752-ZBA and was registered to K.M. of Monroe, Connecticut. K.M. is Bratsenis' sister.

The Government will introduce historical cell site data from the Africa, Feliciano and Bratsenis phones to show that, after the robbery, Africa and Feliciano departed Connecticut and returned to Philadelphia. At approximately 10:42 a.m. on September 26, 2014, the Africa phone accessed a tower in Pelham Manor, New York, which lies between Trumbull, Connecticut and Philadelphia. Subsequent calls indicate that the Feliciano phone likewise traveled through New York, and then to Philadelphia on September 26, 2014, before heading to New Jersey. After the robbery, between approximately 3:19 p.m. and 5:31 p.m., the Bratsenis phone accessed the tower at 3200 Park Avenue in Bridgeport, Connecticut, near Bratsenis' residence. Between

7:12 p.m. and 8:47 p.m., the Bratsenis phone accessed a tower located at 137 Derby Avenue in Derby, Connecticut, near T.L.'s home – where Bratsenis' girlfriend, J.M., sometimes stayed.

At 2:29 p.m. on September 26, 2014 – approximately five hours after the robbery – Feliciano received a text message from a contact named "Migel" (i.e., Miguel Rodriguez) who wrote, "U got that bread."   At 2:57 p.m., Feliciano responded, "Yea my g."   The Government will present evidence that Migel's reference to "bread," was a reference to money, and when Feliciano responded, "Yea my g," he was telling Rodriguez that he had money, which the Government will argue represented proceeds from the bank robbery that took place earlier that day.

Also on the afternoon of September 26, 2014, Feliciano had the following text message exchange with a contact named "My Love Girl" (i.e., his girlfriend):

| | |
|---|---|
| Feliciano: | Get ready wee going to have some fun (4:21 p.m.) |
| Feliciano: | And I got some money for u so u can pay ur bills I told u I got u baby (4:24 p.m) |
| My Love Girl: | Okay babe.   But I got some shxt to do today (4:26 p.m.) |
| Feliciano: | Ok hurry and handle that because wee going to get a house today (4:27 p.m.) |
| Feliciano: | Wee going to get somting nice 1 for u I got the money for it today (5:04 p.m.) |
| My Love Girl: | Like an actual house? (5:04 p.m.) |
| Feliciano: | Lol yea a real house for u baby (5:06 p.m.) |
| My Love Girl: | Okay. How much money is this? Like what you do babe? Lol (5:08 p.m.) |
| Feliciano: | 2 or 3 monts (5:14 p.m.) |

Feliciano:          I got 3 monts for are house (7:07 p.m.)

Also on the evening of September 26, 2014, Feliciano sent a text message to a contact listed as "Unk Ralph" (i.e., Ralph Feliciano) which read, "Wasup unk ralph wana see if u around I wana give you some money." The Government believes that, when Feliciano referred to having money in his text messages to his girlfriend and his uncle, Ralph Feliciano, he was making admissions, referring to proceeds from the robbery he had committed earlier that day.

On September 29, 2014, an officer from the Trumbull Police Department interviewed K.M., the registered owner of the white pickup truck seen in the parking lot of the Trumbull Shopping Mall following the robbery, at her residence in Monroe, Connecticut. K.M. acknowledged that she owned a 1995 white Chevy S-10 pick-up truck, but reported to the officer that her brother George Bratsenis drove the pick-up. K.M. explained that Bratsenis, who lived on Jewett Avenue in Bridgeport, had recently been released from prison after serving 27 years for bank robberies.

The Trumbull Police Department obtained a search warrant for the 1995 white Chevy S-10 pickup truck with Connecticut registration 752-ZBA. At approximately 3:00 p.m., an officer spotted the pickup on Madison Avenue in Trumbull. When the officer pulled over the truck, he identified Bratsenis as the driver. Bratsenis was placed under arrest. Upon execution of the search warrant on the truck, police officers seized, among other things, a long-blade butcher's knife, 13 surgical gloves, five black work gloves and a cut-off sleeve of a sweatshirt. From Bratsenis' person, police seized, among other things, a cellular telephone bearing call number (203) 445-3559 and $627 in cash, including six $100 bills.

On or about September 29, 2014, Trumbull police also interviewed T.L., the individual to whom the license plate on the burned, silver Ford Fusion was registered. T.L. told police that

she had recently given a stack of old license plates to J.M., one of T.L.'s close friends and Bratsenis' girlfriend.

On September 29, 2014, Trumbull and Bridgeport police officers also executed a search warrant on Bratsenis' room at Jewett Avenue, in Bridgeport. Inside a duffle bag in the room, police recovered a pair of black gloves and ammunition, specifically, nine .32 caliber rifle full metal jackets manufactured by Aguila, seven .20 gauge shotgun shells manufactured by Winchester, seven .22 caliber short bullets, manufactured by Eley of England, and six .22 caliber long bullets manufactured by Remington. Agents interviewed the owner of the Jewett Avenue home and his live-in girlfriend, both of whom are expected to testify at trial that they had never seen the ammunition and that it did not belong to them. They are also expected to testify that the room in which the ammunition was found was used exclusively by Bratsenis.

Officers also seized from Bratsenis' room the body of the sweatshirt that matched the cut-off sweatshirt sleeve seized from Bratsenis' pickup truck. The sweatshirt and sleeve were gray in color and stained with red and white paint marks. Video surveillance from the robbery shows one of the suspects (the red hoodie suspect) wearing a gray, homemade mask with eye holes cut out of the fabric. Still images from the surveillance video also show that the mask contained dark markings, consistent with the red paint markings found on the sweatshirt body seized from Bratsenis' room and the cut-off sweatshirt sleeve seized from his vehicle.

4.    The Stratford Bank Robbery

After Bratsenis was arrested, Africa and Feliciano robbed a First Niagara Bank in Stratford, Connecticut, near the location of the carjacking that preceded the Trumbull bank robbery. The Government will prove at trial that, prior to Bratsenis' arrest for the Trumbull bank robbery, Bratsenis and Africa had planned to rob the First Niagara Bank in Stratford

together and had "cased" the bank.    When Bratsenis' arrest interfered with that plan, Africa and Feliciano carried out the robbery together.

Felciano's and Africa's cellphone history places them in the area of Stratford, Connecticut on December 13, 2014.    On December 13, 2014, Africa and Feliciano drove to the First Niagara Bank on 225 Hawley Lane, Stratford, Connecticut, in a blue Jeep Cherokee. Bank video surveillance shows that at approximately 9:18 a.m., two masked men entered the bank and robbed it.    The Government will prove at trial that Africa jumped the counter, and that he and Feliciano pulled out what appeared to be guns.    One said, "Open top drawer, drive through.    Don't mess with me."    As the men fled the bank, at approximately 9:19 a.m., one pointed a gun at two landscapers and said, "Don't even think about it," while the other man said, "Yeah."    Africa and Feliciano garnered $17,000 from the robbery.

At trial, the Government will also seek to introduce numerous prison calls between Bratsenis and others in which Bratsenis discusses, often in code, where he hid the guns used in the robberies, potential false alibis, the "mistake" he made driving the white pickup truck, his connection to Africa, and his frustration that Africa was not committing more bank robberies and providing money to his girlfriend, J.M., while Bratsenis was in prison.

For example, on October 3, 2014, soon after Bratsenis' arrest, Bratsenis and J.M. had the following conversation:

Bratsenis:    Ahhh, if you're really fucked up with Jimmy, I had two thousand dollars in the kitchen cabinet above, above the refrigerator, baby.

JM:    Ok.

Bratsenis:    Pay attention, now.

JM:    Yes.   Yes.

Bratsenis:    You put a chair in front of the refrigerator.    You climb up.

JM:    Yes.    Yes.

Bratsenis:    There's cabinet on the…there's two cabinet doors, ok?    You open them both. Now there was, ahh, empty matches box on the left hand side.    And a couple containers of new plastic cups or whatever.    But underneath, almost at the bottom, is 20 one hundred dollar bills.

JM:    Ok.

Bratsenis:    There's two thousand dollars there.    Try to get…

JM:    Give it to him for the doors?

Bratsenis:    No, no, no, no!    You…

JM:    That's for us.    Ok.

Bratsenis:    Yeah.    You just tell him.    Say, "Hey, I'm sorry."    (laughs).

JM:    Now listen, like basically, I mean, ahh, honey, there's just so cra…so much craziness.    At your sister's, I was there.    They nicely knocked on the door.    At Jimmy's, they kicked in the front and back.    Your room was literally upside down. All they took was a pair of boots, apparently.    And that piece of paper you left on your bed….

….

JM:    Now listen, could I ask you one question? (pauses)

Bratsenis:    What?

JM:    Ahhhhhh.

Bratsenis:    What baby?

JM:    Was there three all together?

Bratsenis:    Huh?

JM:    There wasn't just two.    There were three, right?

Bratsenis:    Three what?

JM:          God.   Nothin'.   Alright.

Bratsenis:   Ahhh, three people that are…

JM:          Yes.   Yes.

Bratsenis:   …accused of the crime?

JM:          Yes.   Yes.   Because…

Bratsenis:   Yes.

JM:          Because Jimmy, Jimmy only, Jimmy only found two keys.   He only found two
             keys that back door.     And I, and I was like, no, I think there's three.

Bratsenis:   Oh.

JM:          You know.   They, they were like way down below.   They were like.   They were
             like in Hell.

Bratsenis:   Well, honey.   There was one key on top of the Jacuzzi thing.

JM:          Ok.   Ok.

Bratsenis:   For the back door.

JM:          Ok.

Bratsenis:   I don't know if he got it.   It's all burnt up…

JM:          Ok.

Bratsenis:   …it used to be in the old grill.

JM:          Ok.   What about…

Bratsenis:   But there's one key there.

JM:          Alright, honey.   And what about the dirt and stuff?   There, there was, there was
             two keys down there or three?

Bratsenis:   And what about what, now?

JM:          In the dirt, baby.   In the sand.

Bratsenis:    Oh.   I, I.   You got me mixed up, now, baby.

JM:           Yeah, baby.   Because…

Bratsenis:    Ok.   Look.   You and my sister gotta come here this week…

JM:           Ok.

Bratsenis:    …and try to come see me on a window visit or a contact visit.   Find out how you get the forms to fill out to get approved to get on my visiting list.

At trial, the Government will prove that when J.M. and Bratsenis referred to the "keys," they were referring to the guns used in the robbery, which Bratsenis had secreted at the Jewett Avenue property where he was living.

On November 30, 2014, Bratsenis and a friend with the initials G.I. engaged in the following conversation:

GI:           They say that you were caught with marked money on you.

Bratsenis:    Nah that's bullshit.   Because my lawyer, he's go…having a…my public defender's right now going through a, through, through a bank robbery trial. Because I…

GI:           Right.

Bratsenis:    …told him to get that money back because I borrowed it off my sister two days before I got arrested because I was gonna get a car, my sister loaned me fifteen hundred dollars.   It was all in hundreds.   She went to her bank to get the money. So how could that money be tied up in another bank?

GI:           Ok.

Bratsenis:    And my public defender said they don't even do that shit.   They can't prove it, anyway.

At trial, the Government expects to prove that K.M., Bratsenis' sister, did not loan Bratsenis any money in the days prior to the robbery.   Rather, the evidence will show that it was Bratsenis who gave $500 in cash to K.M. just after the robbery.

On January 10, 2015, J.M. and Bratsenis had the following conversation:

JM:            So you know what I forgot.    I forgot to tell you that I talked to my brother last
               week.    Ahh, Marie.

Bratsenis:     Your brother?    Your younger?

JM:            Yeah my brother…no my brother and his wife, Marie.

Bratsenis:     Yeah.

JM:            I talked to my brother B, his wife Marie.    They're in Pennsylvania.    It was so
               nice to hear from them.    I miss 'em and love 'em so fuckin' much.

Bratsenis:     When's the last time you heard from 'em?

JM:            Ah, it's been a while.    It's been a while.    Last time, last time I talked to him, I
               was kind of having a major meltdown, hmm.

Bratsenis:     Unh, huh.

JM:            And all I kept saying is, is like, umm, like these fucking pigs keep asking where
               the nigger is…

                   ….

JM:            And after that, and, and that was the last time I talked to them, and…and I talked
               to them the other day.    Totally forgot to tell you, and you know…

Bratsenis:     That's great.

JM:            …they miss, they miss and love everyone.

Bratsenis:     Well, where they live at?

JM:            You know, I don't even know.

Bratsenis:     (UI)

JM:            You know I tried, I tried calling them and I just got the voicemail.    You know, I
               said, "What's up?"    And then, umm, you know about an hour later…

Bratsenis:     That's nice they called you back, though.    That's, that's nice.

JM:            Yeah.    It was very necessary.

The Government will provide evidence that, in Bratsenis' cellular phone, Bratsenis had Africa's cellphone number stored under the contact name "Marie B." The Government believes that Bratsenis' contacts of Africa through J.M. were an effort to keep the conspiracy alive.

On March 16, 2015, Bratsenis and J.M. had the following conversation:

JM:          I talked to my brother today.   Made my day!

Bratsensis:  Vito?

JM:          No.   I talked to my brother and his wife Marie.

Bratsenis:   (UI)

JM:          Honey?

Bratsenis:   Yeah.

JM:          Did you hear what I said?

Bratsenis:   You talked to your brother, what?

JM:          And, and his wife, Marie.

Bratsenis:   Oh.   And where are they?

JM:          (UI)   Umm, right, right where I left 'em.

Bratsenis:   Where?

JM:          Ayy, ahh, I don't know.   Fucking Jersey or fuck, fucking Pennsylvania.   I don't know.   The same old shit.

Bratsenis:   Oh.   Oh.

JM:          Nothing changed.

Bratsenis:   Oh, oh.   Oh, ok.   I though, I thought you found out exactly.   I mean.

JM:          Ahh.   Well no, no.   He just has to check in with his family every so often and he couldn't stress it enough how much he loves me and how much he loves you and umm, you know, he said you know til our, til our dying days, Jan, I never met family like you.   Like family family, you know.

On March 19, 2015, Bratsenis and JM engaged in the following telephone conversation:

Bratsenis:    Did you see your brother the other day or not?

JM:    I wish.   I wish.

Bratsenis:    No.   I thought, I thought you were gonna see him.   I thought.   That's the way we left it.

JM:    No.   It was just, it was just…we wanna see each other but we're both kinda broke. We're both kinda really….I got like 40 bucks in my pocket that I've had in my pocket.

Bratsenis:    Yeah, but it's your brother.   He should know.   I mean, he, he ain't getting no younger.   He's gotta go out there and work.   I mean like what the fuck, man.

JM:    I know. He, we all know.

Bratsenis:    In life you gotta take shots.   I mean what the fuck.

JM:    That's the one thing.   The one thing with him being family, I just wanted to show him what ring I wanted to show you to help out with (UI)…

Bratsenis:    Yeah.   Yeah.   I hear you.   I hear you.

JM:    That's all I wanna do.   That's all I want is a nice ring on my finger and I won't ever ask for nothing again.

Bratsenis:    Right.   But like he, he, he knows, you, what you are going through and everything. He, he should be right up there and step to the plate.   I mean like see that's the difference of between him and me.   I'm, I'm gonna go.   You know I got…I'm gonna go do what I gotta do.   You know, you know that.   You know me well enough to know that.

JM:    That's why I fucking love you so fucking much.

Bratsenis:    But, ahh, you know man if you are gonna talk about it, mother fucker, be about it. (Laughs)

At trial, the Government expects show that, when J.M. referred to her "brother" she was

referring to Africa.   The Government expects to show that, when J.M. referred to wanting a

"ring" on her finger, she was referring to wanting money from Africa.   The Government will

further argue that, when Bratsenis stated that Africa should "go out there and work" and "step up to the plate," he was stating that Africa should continue to rob banks and provide proceeds from the robberies to J.M. in furtherance of the conspiracy.

On June 12, 2015, Bratsenis and J.M. had the following telephone conversation:

JM:          How was court?

Bratsenis:   Ahhh….not too good.

JM:          What did they say?

Bratsenis:   Well there is another name on my indictment

JM:          Who?

Bratsenis:   Bomani Africa.

JM:          What?

Bratsenis:   Got busted a couple weeks ago.   I don't know the details yet.   I won't find out…

JM:          Who the fuck is that?

Bratsenis:   I don't know.   Some dude…

JM:          Yeah.

Bratsenis:   …that I was in jail with.   In prison with.

JM:          Really?

Bratsenis:   Yeah.

JM:          What the fuck?

Bratsenis:   So, I will find out all the details in a couple weeks.   Whatever.   When, when my lawyer gets the paperwork.   But, ahh, that really fucked up my day.   And then, when he made this other comment, that really fucked up my day.

JM:          What happened?   What?

Bratsenis:   There's gonna be a third name added to that indictment.

JM:          Who?

Bratsenis:   He didn't give me no name, honey.   He just told me there's gonna be a third name added to that indictment.

JM:          Well, I know Tanya got indicted.

Bratsenis:   Well I understand that but I'm saying on my indictment papers, there's gonna be a third name.   Me, Bomani Africa and someone else.

JM:          Wow.   Fuck me.   That just turned my stomach.

Bratsenis:   And two pointers I wanna give you.   Be aware your phone might be bugged. Because like a while back you was talking to little Jimmy Pascale.

JM:          Yup.

Bratsenis:   He mentioned something about being planted in his back yard and I ain't talking about no pot of flowers or nothing like that.   I'm talking about things that they need metal detectors with.     They got a copy of that…

JM:          Who said that?

Bratsenis:   …on.

JM:          Who said that?

Bratsenis:   Honey.

JM:          I'm saying…who…

Bratsenis:   I got…I got all, every conversation…phone conversation you and I ever had since I been in jail and I got a copy of every letter that I ever wrote you or I got here in jail since I been in jail. But…

JM:          Wow.

Bratsenis:   …that topic of conversation came up.   And one other thing.   When you settled that lawsuit with your attorney over there in, in West Haven that time for your…

JM:          Yeah.

Bratsenis:   …neck and you gave me money to hold.

| | |
|---|---|
| JM: | Yup. |
| Bratsenis: | And I had it over Jimmy's house and I had it up in the cabinet in the hiding place. So… |
| JM: | Yup. |
| Bratsenis: | …nobody would take it or anything and like I wouldn't even spend it. |
| JM: | (UI) |
| Bratsenis: | They got a copy of that conversation, too.   So like, that's your lawsuit money, so like anybody asks or whatever.   You went up in the cabinet where I told you I had the money that… |
| JM: | Yeah.   Yeah. |
| Bratsenis: | …you told me to hold for you.   You got the story straight? |
| JM: | I know baby, I know.   Like… |
| Bratsenis: | Well baby, I'm just…God forbid anything happened to you it would break my heart. |
| JM: | Wow.   I feel like I gotta take a big shit right now. |
| Bratsenis: | It would break my heart if anything ever happened to you.   Do you hear me? That's why I wanted to tell you be careful.   You gotta be focused and stuff, honey. You can't go off half cocked.   You gotta plan.   You gotta fuckin' think things through. |

Bratsenis' reference to Africa as "some dude I was in jail with," is an admission that describes the genesis of his and Africa's relationship and the reason he trusted Africa.   The Government will seek to prove that the remainder of the conversation is Bratsenis' entry into an agreement with J.M. that J.M. provide false statements to law enforcement if asked about the October 3, 2014 conversation (transcript above) between Bratsenis and J.M. in which they discussed firearms and cash secreted at the Jewett Avenue residence.

      B.     <u>The Charges</u>

Bratsenis is charged in Counts One through Four of the Fourth Superseding Indictment, while Felciano is charged in Counts Two through Five of the Fourth Superseding Indictment. Count One charges Bratsenis with Unlawful Possession of Ammunition by a Convicted Felon, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(1) on or about September 29, 2014. The charge requires that the following elements be proven:

1. That the defendant was convicted in any court of a crime punishable by imprisonment for a term exceeding one year, as charged;

2. That the defendant possessed the firearm or ammunition as charged; and

3. That the possession charged was in or affecting commerce.

Count Two charges Bratsenis and Feliciano, in violation of Title 18, United States Code, Section 371, from in or about 2013 through December 2014. The charge requires that the following elements be proven:

1. Two or more persons entered into an unlawful agreement to rob banks; and

2. The defendant knowingly and willfully became a member of the conspiracy and did so with the intention of furthering an objective of the conspiracy.

Count Three charges Bratsenis and Feliciano with armed bank robbery, in violation of 18 U.S.C. § 2113(d). Count Five charges Feliciano with armed bank robbery under the same statute. The elements of armed bank robbery, pursuant to 18 U.S.C. § 2113(d) ,are:

1. The defendant took money from the presence of another, while that money was in the care or custody of a bank;

2. Such taking was by force and violence or intimidation;

3. The defendant put the life of others in danger by the use of a dangerous weapon or device while taking the money; and

4. The deposits of the bank were then insured by the FDIC.

Count Four charges Bratsenis and Feliciano with carjacking, in violation of 18 U.S.C. § 2119. The elements of a carjacking charge under 18 U.S.C. § 2119 are:

1.    The defendant intentionally took a vehicle from a person;

2.    The defendant did so by means of force and violence or intimidation;

3.    The motor vehicle had been transported in interstate or foreign commerce;

4.    The defendant intended to cause death or serious bodily injury.

Conditional intent is sufficient to satisfy the mens rea requirement of intent to cause death or serious bodily injury.    That is, the government need not prove "an unconditional intent to use violence regardless of how the driver responds to his threat."    *Holloway v. United* States, 526 U.S. 1, 5-6 (1999) (footnote omitted).    Notably, the Sixth Circuit has concluded that the use of a loaded gun – or even an unloaded one – is not required to satisfy the mens rea requirement of the carjacking statute.    *See United States v. Fekete*, 535 F.3d 471, 480 (6th Cir. 2008)    The court explained: "The requisite mens rea can be shown by evidence of an intent to use a knife, a baseball bat, brute force, or any other means that indicates an ability and willingness to cause serious bodily harm or death if not obeyed"    *See id.* (affirming defendant's carjacking conviction after determining that defendant possessed the specific intent to harm because circumstantial evidence indicated that gun pointed loaded gun at victim, threatened victim, and presumably was aware that car was occupied when he commandeered it).    In this case, the Government will prove that Africa knew that the victim D.S. occupied the car he intended to steal and pointed at D.S. a gun that Bratsenis had provided to him.

## II.   **Evidentiary Issues**

   A. Evidence of Bratsenis' and Africa's prior relationship to explain how the illegal relationship between the bank robbers developed and to explain their mutual trust

As discussed above, Bratsenis and Africa met in New Jersey prison, where Bratsenis was serving a sentence for bank robbery and Africa was serving a sentence for robbery, and they were in the same cell-block for almost eight years.

It is well settled in the Second Circuit that "'it is within the [trial] court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.'"   *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999), quoting *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993); *United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009)(cooperator's testimony that he had sold guns with defendant previously was properly admitted because "[i]t showed development of the relationship between Defendant and [cooperator]" and was "especially true in a case . . . where the prior dealings between two coconspirators show 'the basis for the trust between' the co-conspirators"); *United States v. Pascarella*, 84 F.3d 61, 72-73 (2d Cir. 1996)(proper to allow "government to introduce evidence of Breheney's past gambling dealings with some of the co-conspirators to enable the government to 'establish the basis of a trust relationship between Smith, Lamberti and Breheney'")(quoting district court ruling); *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir.1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case"); *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy

charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed").

The evidence that Bratsenis was incarcerated for bank robbery is admissible for several proper purposes. That Africa and Bratsenis were incarcerated together for a substantial period established Africa's relationship with Bratsenis, demonstrated why Bratsenis would trust Africa, *See United States v. Diaz*, 176 F.3d at 79. Proving the genesis of the trust relationship in this case is particularly probative because, absent proof of the mutual incarceration, the jury could improperly determine that Africa and Bratsenis could not have entered into a conspiracy together because Africa lived his entire life in New Jersey and Pennsylvania, while Bratsenis lived exclusively in Connecticut while not in prison. That Bratsenis had previously engaged in bank robbery also is particularly relevant to show: (1) how the conspirators developed their modus operandi for the current conspiracy; (2) why they selected their modus operandi (to avoid detection while maximizing the amount of money they could steal); (3) that they possessed the knowledge to commit the charged bank robberies; and (4) why Bratsenis and Africa led the conspiracy and were able to recruit others. In particular, the evidence concerning Bratsenis' relationship with Africa is essential to explain their expertise and knowledge once in the bank -- why he and Africa knew from which drawers to demand cash at the banks, why they were able to avoid the decoy cash that banks usually instruct their employees to turn over during a robbery, and why they knew how much time they had before they had to flee.

The probative value of this evidence is not outweighed by the danger of unfair prejudice. As the Second Circuit has explained, evidence of uncharged acts is not unfairly prejudicial when that evidence does not involve conduct "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (1999)(in civil rights trial for excessive force, upholding district

court's admission of evidence that defendant police officer had choked an arrestee in the past due to similarity to charged conduct).   Among other crimes, Bratsenis is charged with participation in and the planning of armed bank robberies (*see* Fourth Superseding Indictment ¶¶ 10 (Count Three: Armed Bank Robbery), 2-9 (Count Two: Bank Robbery conspiracy)), as well as the carjacking of D.S. (*see* Fourth Superseding Indictment ¶ 11(Count Four: carjacking)).   As a result, any risk of prejudice generated by introducing evidence of Bratsenis' incarceration for an uncharged bank robbery nearly thirty years earlier would not substantially outweigh its probative value under Rule 403.

The risk of undue prejudice is further reduced in this case because Bratsenis' status as a felon is a necessary element of one of the crimes with which he is charged, (*see* Fourth Superseding Indictment ¶¶ 1 (Count One: Unlawful Possession of Ammunition by a Felon)). Because Bratsenis' prior felony conviction is a fact that will be before the jury, the Second Circuit's general concern that significant prejudice may arise if proof of a prior conviction is put before a jury during the Government's case-in-chief, *see United States v. Harrington*, 490 F.2d 487, 490 (2d Cir. 1973) (an accused who does not take the stand in his or her own defense "is entitled to have the existence of any prior criminal record concealed from the jury") is significantly alleviated.

Nor is this a situation in which the Government seeks to introduce Bratsenis's prior incarceration with Africa through only external sources – the testimony of a prison official or of K.M.   As noted above, in a prison conversation with his girlfriend, J.M., on June 15, 2015, Bratsenis informed J.M. that his co-defendant, Bomani Africa, was a person he had spent time "in jail with."   This admission bore substantial indicia of reliability and Bratsenis should not be allowed to hide his admission from the jury simply because it prejudices him.   *Cf. United States v.*

*Matthews*, 20 F.3d 538, 546 (2d Cir. 1994)(admission to girlfriend made in non-coercive or custodial circumstances was sufficiently trustworthy to be admitted); *United States v. Centracchio*, 265 F.3d 518, 531-32 (7th Cir. 2001)("probative evidence is always prejudicial in this literal sense" of making "the defendants look guilty").

In addition, any prejudice that may flow from the admission of evidence concerning Bratsenis' prior robbery can be minimized by the inclusion of a limiting instruction both at the time the evidence of Bratsenis' prior incarceration for bank robbery is elicited and again during the jury charge. The Government has no objection to such a limiting instruction.

B.     Hearsay Evidence

The bulk of the Government's evidence in this case will be in the form of law enforcement testimony, witnesses like J.M. and others, who might be viewed as having conspired at some point with Bratsenis, business records and consensually recorded taped conversations.    Some testimony, as noted above, will be in the form of out-of-court statements, against which the defendants may choose to lodge objections pursuant to Fed. R. Evid. 801-804. The Government respectfully submits that those objections should be overruled.

Federal Rule of Evidence 801 defines hearsay as a statement "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." The rule, however, excepts from the hearsay definition certain statements, including statements "made by the [opposing] party in an individual or representative capacity," statements "of which the party has manifested an adoption or belief in its truth," and statements "made by the party's coconspirator during and in furtherance of the conspiracy."    Fed. R. Evid. 801(d)((2)(A), (B) & (E).

As noted above, the Government intends to introduce certain recorded phone calls that

Bratsenis has made from prison. Bratsenis' own statements during those calls are admissions, not hearsay. *See, e.g., United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002)("[s]tatements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party"). Moreover, the recorded statements of the person with whom Bratsenis is speaking, usually his girlfriend J.M., are not hearsay because the Government will not offer them for their truth, but to put Bratsenis' own statements into context. *See United States v. Gaytan*, 649 F.3d 573, 579 (7th Cir. 2011) ("[A] confidential informant's out-of-court statements are not hearsay if they are offered not for the truth but to put the defendant's statements in context or to make what he said and did in reaction to the informant's statements intelligible to the jury."), *see also United States v. Hendricks*, 395 F.3d 173, 184 (3d Cir. 2005) ("non-conspirator" half of a recorded conversation is not proffered for its truth, but rather to put conspirator's statements in context); *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006) (applicable to emails)*; United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990) ("So long as the informant's recorded statements were not introduced for the truth of the matter asserted, but only to establish a context for the recorded statements of the accused, the defendant's Sixth Amendment rights are not transgressed."); *United States v. Deitz*, 577 F.3d 672, 683-84 (6th Cir. 2009) (FBI agent's testimony about informant's statements was offered to provide "mere background information" about why FBI followed defendant, not to prove the truth of what informant asserted); *United States v. Mayes*, 370 F.3d 703 (7th Cir. 2004) (out-of-court statements by two informants that they could purchase cocaine at particular address were not hearsay, since they were admitted at trial for conspiracy to distribute narcotics not for their truth, but rather to explain why police officers took steps to make controlled buys and to execute search warrants at that address).

Nor are the statements made by Bratsenis' co-conspirators[1] made to each other or to other witnesses during the course of the conspiracy and in furtherance of the conspiracy excludable as hearsay. Thus, where J.M. speaks to Bratsenis about inventing an alibi for his ammunition possession, her statements are admissible as co-conspirator's statements. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999)("The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment"). In a similar vein, the Government will introduce the voicemails Africa left on Felciano's cellphone immediately prior to the People's Bank robbery: "I told these people I'm coming, bruh. I been gave them my word and that's all I got." These voicemails are admissible not only against Feliciano, but Bratsenis under Federal Rule of Evidence 801(d)(2)(E), which provides that "a statement by a co-conspirator of a [defendant] during the course and in furtherance of the conspiracy" is not hearsay and may be admitted at trial.

"In order to admit a statement under this Rule, the court must find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (enumerating four prerequisites for admissibility of coconspirator statements and establishing preponderance of evidence standard); *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996); *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993); *United States v. Rivera*, 22 F.3d 430,

---

[1]Notably, an indictment need not charge a defendant with a conspiracy for coconspirator statements to be admissible. *See, e.g., United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979)("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment").

435-36 (2d Cir. 1994); *United States v. Daly*, 842 F.2d 1380, 1386 (2d Cir. 1988); *United States v. Mastropieri*, 685 F.2d 776, 786 (2d Cir.1982); *United States v. Paredes*, 176 F. Supp. 2d 183, 186 (S.D.N.Y. 2001). A district court's finding in this regard must be supported only by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175. A district court's decision to admit co-conspirators' statements under Rule 801(d)(2)(E) will be upheld unless clearly erroneous. *United States v. Thai*, 29 F.3d 785, 814 (2d Cir. 1994).

a. Existence of, and membership in, the conspiracy

To be admissible, the out-of-court statement must have been made by a conspirator during the course of a conspiracy. F.R.E. 801(d)(2)(E). Accordingly, the government must offer evidence establishing by a preponderance of the evidence the existence of the conspiracy and the participation of both the declarant and the defendant in the conspiracy. *Tracy*, 12 F.3d at 1196; *see United States v. Casamento*, 887 F.2d 1141, 1171 (2d Cir. 1989) (post-statement events are admissible to establish that a conspiracy existed at the time certain statements were made). Again, when determining whether a conspiracy existed and the defendant and declarant were members of the conspiracy, the court may consider the hearsay statements themselves. *Diaz*, 176 F.3d at 66.

The Second Circuit has construed the conspiracy requirement quite broadly. Courts have held that the declarant need not be an indicted coconspirator for the hearsay statement to be admissible in court so long as the statement furthers the interest of the conspiracy. *See United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002). There is also no requirement that the person to whom the statement was made also be a member of the conspiracy. *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199.

b. Statements made in furtherance of the conspiracy

Once the existence of a conspiracy and its membership is established, the Government must show that the statements were made "in furtherance" of the conspiracy. Generally, a statement will qualify as "in furtherance" of the conspiracy if, for example, it: (1) prompted the listener to respond in a way that facilitated the criminal activity, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); *United States v. Maldonado Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); *Katsougrakis*, 715 F.2d at 778; (2) encouraged or induced someone to participate in the conspiracy, *see Desena*, 260 F.3d at 158; *United States v. Heinemann*, 801 F.2d 86, 95 (2d Cir. 1986); (3) provided reassurance or maintained trust and cohesiveness among conspirators, or informed them of the progress or status of the conspiracy, *see Desena*, 260 F.3d at 158; *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); or (4) identified members of the conspiracy, *see United States v. Persico*, 832 F.2d at 716 (statements informing conspirator of the identity and activities of coconspirators are "in furtherance" of conspiracy); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *Agar v. United States*, 493 U.S. 982 (1989); *United States v. Perez*, 702 F.2d 33, 37 (2d Cir. 1982). Moreover, statements may further the conspiracy even if not "'exclusively'" or "'primarily'" designed to further its goals. *See Tocco*, 200 F.3d at 419 (*quoting United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994)). Similarly, statements designed to promote or facilitate achievement of the goals of the conspiracy by communicating with a person who is not a member of the conspiracy in a way that is designed to achieve the plan's goals are also considered to have been made "in furtherance of" the conspiracy. *See Rivera*, 22 F.3d at 436; *Beech Nut Nutrition Corp.*, 871 F.2d at 1199; *Katsougrakis*, 715 F.2d at 778; *Paredes*, 176 F. Supp. 2d at 187.

However, for a statement to be found to have been made "in furtherance of" a conspiracy, the Second Circuit has held that it must be more than "idle chatter" or a "merely narrative"

description by one conspirator of the action of another. *Maldonando-Rivera*, 922 F.2d at 958 (*quoting Beech-Nut Nutrition Corp.*, 871 F.2d at 1199). "While statements that are merely idle chatter or that are entirely retrospective are not in furtherance of the conspiracy, statements relating to past events meet the in-furtherance test if they serve some current purpose of the conspiracy." *Thai*, 29 F.3d at 813.

c. Statements made during the course of the charged conspiracy

Finally, the coconspirator statements must be made during the course of the conspiracy. *See Bourjaily*, 483 U.S. at 175; *Rivera,* 22 F.3d at 435-36; *Tracy*, 12 F.3d at 1196; *United States v. Lombardozzi*, 2003 WL 1956290, at *1 (S.D.N.Y. 2003). Statements made during the course of the conspiracy include statements made by a coconspirator before the completion of the criminal object of the conspiracy. *See Haywood v. Portuando*, 288 F.Supp.2d 446, 471 (S.D.N.Y. 2003) (statements are made during the course of the conspiracy if made prior to the realization of overall goal). Although a statement is not made during the course of the conspiracy when it is made after the main objective of the conspiracy has been accomplished, where particular crimes have already been committed, "the conspiracy does not necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise terminated." *United States v. Arrington*, 867 F.2d 122, 130 (2nd Cir. 1988). Absent affirmative evidence of withdrawal from the conspiracy, a conspirator's participation "is presumed to continue until the last overt act by any of the conspirators." *United States v. Greenfield*, 44 F.3d 1141, 1150 (2d Cir. 1995). Additionally, events occurring after the statement may be used to show that the statement was made during the course of a conspiracy. *Casamento*, 887 F.2d at 1171.

d. The defendants were members of the charged conspiracy

Here, there is substantial evidence to establish the existence of the charged bank robbery

conspiracy.    Based upon the evidence that will be adduced at trial, the government will readily establish beyond a preponderance of the evidence that the conspiracy existed and that the defendants, along with Africa and others, were members of the conspiracy.

    e. The statements were made during the course of the conspiracy

The co-conspirator statements that the government intends to introduce were all made during the course of the conspiracy.    Although Bratsenis was arrested during the course of the conspiracy, Africa and Feliciano continued the conspiracy after his arrest by robbing the First Niagara Bank in Stratford, Connecticut – which Bratsenis and Africa had planned to rob together.    The mere fact of a coconspirator's arrest does not, without affirmative evidence of the defendant's withdrawal, terminate the conspiracy. *United States v. Baldwin*, 774 F.3d 711, 734 (11th Cir. 2014)("A defendant may be 'responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy. [N]either arrest nor incarceration automatically triggers withdrawal from a conspiracy'")(citations omitted); *United States v. Bowie*, 618 F.3d 802, 813 (8th Cir. 2010)(finding defendant part of the conspiracy even though he was "imprisoned during vast majority" of charged period). Thus, statements made by coconspirators, even if made to persons who are no longer a member of the conspiracy, qualify as coconspirator statements if they are made during the course of and in furtherance of the conspiracy. *See Bourjaily v. United States*, 483 U.S. at 175-76.

Moreover, there is no evidence to suggest that Bratsenis affirmatively withdrew from the conspiracy.    To the contrary, in recorded prison call conversations with J.M., for example on March 19, 2015, Bratsenis complains about Africa's failure to continue to "work" (i.e. , rob banks) and to provide money to J.M. ("Yeah, but it's your brother.    He should know.    I mean, he, he ain't getting no younger.    He's gotta go out there and work.    I mean like what the fuck,

man"), hardly the comments of one who has affirmatively withdrawn from the conspiracy to rob banks.   In the absence of any affirmative withdrawal from the conspiracy, Bratsenis is responsible for not only all overt acts but all conversations in furtherance of the conspiracy committed during the charged conspiracy, including the Stratford bank robbery which took place after his arrest.   *See, e.g., United States v. Greenfield*, 44 F.3d at 1150 ("'Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators'")(citation omitted).

      f. <u>Other reasons for admission of statements</u>

      Of course, many statements made by the defendants' coconspirators are admissible for reasons other than the fact that they are admissible under Fed. R. Evid. 801(d)(2)(E).   Thus, statements of a coconspirator that are not hearsay include:    misrepresentations or lies, *see United States v. Neadeau*, 639 F.2d 453, 455 (8th Cir. 2011) (a declarant's lies are not hearsay because they are not offered for the truth of the matter asserted), *see also United States v. Yielding*, 657 F.3d 688, 700 (8th Cir. 2011) (agent's testimony about witness's statement was offered "to demonstrate that she used a false 'cover story' about a 'loan,' not to prove the truth of her assertion to the FBI" that the transaction was a loan); statements introduced to show the effect on the listener, *see, e.g., United States v. Song*, 436 F.3d 137, 139 (2d Cir. 2006) (not hearsay if testimony offered "to demonstrate motivation behind Song's actions"); *United States v. Puzzo*, 928 F.2d 1356, 1365 (2d Cir. 1991)(not hearsay if admitted to show effect on listener); orders or imperatives, *see United States v. Waters*, 627 F.3d 345, 358 (9th Cir. 2010) ("Tell the truth" is not hearsay because it is an imperative, not an assertion of fact); *United States v. Sheperd*, 739 F.2d 510, 514 (10th Cir. 1984) ("An order of instruction is, by its nature, neither true nor false, and thus cannot be offered for its truth."); *United States v. Keane*, 522 F.2d 534,

558 (7th Cir. 1975)(a statement which is similar to an order "is not capable of being true or false, and thus is not offered for the truth of the matter asserted."); statements introduced to put the defendant's statements in context, *see United States v. Gaytan*, 649 F.3d 573, 579 (7th Cir. 2011) ("[A] confidential informant's out-of-court statements are not hearsay if they are offered not for the truth but to put the defendant's statements in context or to make what he said and did in reaction to the informant's statements intelligible to the jury"); statements to show why individuals took action, *see United States v. Cruse*, 805 F.3d 795, 810 (7th Cir. 2015) (DEA agent's statement that informants tips had led to search warrants was not inadmissible hearsay because "[w]e have recognized repeatedly that statements offered to establish the course of the investigation, rather than to prove the truth of the matter asserted, are nonhearsay and therefore admissible"), *United States v. Deitz*, 577 F.3d 672, 683-84 (6th Cir. 2009) (FBI agent's testimony about informant's statements was offered to provide "mere background information" about why FBI followed defendant, not to prove the truth of what informant asserted); questions that are not intended as assertions, *see, e.g., United States v. Rodriguez-Lopez*, 565 F.3d 312, 314-15 (6th Cir. 2009) (statements made by caller looking for heroin not hearsay); *United States v. Long*, 905 F.2d 1572, 1580 (D.C. Cir. 1990)("Because the caller's questions were nonassertive, they fall outside the scope of the hearsay rule"); *Headley v. Tilghman*, 53 F.3d 472, 477 (2d Cir. 1995)("[Q]uestions are non-hearsay"); a verbal act, *see, e.g., Lutwak v. United States*, 344 U.S. 604, 618 (1953); *United States v. Stratton*, 779 F.2d 820, 830 (2d Cir. 1985)("Stratton's threats are not hearsay because not offered for truth; the threats are verbal acts"); an authorized admission, Fed. R. Evid. 801(d)(2)(c); *see also United States v. Amato*, 356 F.3d 216, 219 (2d Cir. 2004)(allowing the use of defense counsel's letter as evidence against defendant); and a

statement by an agent concerning a matter within the scope of the agency or employment relationship made during the existence of the relationship. Fed. R. Evid. 801(d)(2)(D); *see also United States v. Shunk*, 881 F.2d 917, 921 (10th Cir. 1989)(brother's statements to undercover officer where he made clear that he was acting as defendant's agent are not hearsay).

Thus, in this case, a number of J.M.'s statements during the prison calls are admissible because they simply are not being offered for their truth, but rather show her use of code, are questions, provide a context for Bratsenis' responses, demonstrate her knowledge of the conspiracy, and her reasons for taking certain actions.

If a coconspirator's statement would otherwise be hearsay, it can still be admitted under one of the myriad of exceptions to the hearsay rule outlined in Fed. R. Evid. 803. For example, a coconspirator's statement could be admitted as a then-existing mental condition, Fed. R. Evid. 803(3); *see also United States v. Cicale*, 691 F.2d 95, 104 (2d Cir. 1982)(hearsay exception, which codifies the *Hillmon* doctrine, "allows the implication to be drawn from a declarant's statement that he had 'relations' with the other persons implicated which made his criminal plan 'feasible,' thereby rendering such statements admissible 'to show the existence of a conspiracy' from which a third party's participation may be inferred")(citations omitted).

In contrast, under the Federal Rules of Evidence, defendants may not introduce their own out-of-court statements through the testimony of other witnesses. *See United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are 'hearsay, and ... not admissible.'") (citation omitted); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior

statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). If either Bratsenis or Feliciano want to provide the jury with testimony, they must take the stand.

Allowing Bratsenis to offer his prison telephone or letter statements into evidence through other witnesses would provide an end-run around the adversarial process by allowing him to "testify" without being subject to "the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine." *Williamson v. United States,* 512 U.S. 594, 598 (1994). Accordingly, the Government intends to object strenuously to any effort by Bratsenis or Feliciano to elicit testimony or evidence about their own self-serving statements.

<u>Conclusion</u>

For the foregoing reasons, the Court should permit the Government to introduce the

relevant evidence discussed above.

Respectfully submitted,
DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/

RAHUL KALE
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. phv 02526
1000 LAFAYETTE BLVD, 10TH FLOOR
BRIDGEPORT, CT
(203) 696-3000

AMY BROWN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. ct29771
1000 LAFAYETTE BLVD, 10TH FLOOR
BRIDGEPORT, CT
(203) 696-3000

## <u>CERTIFICATION</u>

I hereby certify that on February 11, 2016, a copy of the foregoing trial memorandum and notice of intent to offer evidence was filed electronically and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/S/ Rahul Kale

RAHUL KALE
ASSISTANT UNITED STATES ATTORNEY